IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

Shipyard Brewing Company, LLC,

    Plaintiff,

v.

Logboat Brewing Company, LLC, et al.

    Defendants.

No. 2:17-cv-04079-NKL

**ORDER**

Plaintiff Shipyard Brewing Company, LLC brought this action to enforce its own trademarks and trade dress—which it claims defendants Logboat Brewing Company, LLC and Tyson Hunt have infringed and continue to infringe. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants move for summary judgment on all of Shipyard's remaining claims.[1] Doc. 64.

Shipyard alleges that Logboat's registered trademark SHIPHEAD GINGER WHEAT "is substantially similar" to Shipyard's registered trademarks, including "SHIPYARD," "SHIPWEAR," "PUMPKINHEAD ALE," "PUMPKINHEAD" with design, "MELONHEAD," "MELONHEAD" with design, and "APPLEHEAD." Doc. 38 (Amended Complaint), ¶¶ 12, 14, 17, 18. Similarly, Shipyard alleges that Logboat's use of a beer can with a certain color scheme and a "schooner logo" for Shiphead Ginger Wheat Beer infringes Shipyard's trade dress for its signature Export Ale beer. *Id.*, ¶¶ 18, 54.

---

[1] Shipyard's amended complaint also asserted a claim for defamation (Doc. 38), but after Logboat moved for summary judgment, the parties stipulated to the dismissal of that claim with prejudice. Doc. 70. Thus, only the trademark and trade dress claims, against both defendants, remain.

For the reasons discussed below, the Court grants Defendants' motion for summary judgment.

## I. UNDISPUTED FACTS

Logboat decided to name their ginger wheat beer "Shiphead" because of an original painting titled "Shiphead" created by a family friend in 2003. Doc. 65, Statement of Uncontroverted Material Facts ("SOF"), ¶ 4; Doc. 69, Plaintiff's Responses to Defendants' Statement of Uncontroverted Material Facts ("Response SOF"), ¶ 4. The Shiphead painting is used, with the artist's permission, on the packaging for Logboat's Shiphead Ginger Wheat Beer. Doc. 65, SOF, ¶ 5; Doc. 69, Response SOF, ¶ 5.

Neither Shipyard nor the Defendants are aware of any actual confusion between SHIPYARD beer and SHIPHEAD GINGER WHEAT beer. Doc. 65, SOF, ¶¶ 19-21; Doc. 69, Response SOF, ¶¶ 19-21. Furthermore, Shipyard admits that "ship" and "head" is each, separately, a generic word. Doc. 65, SOF, ¶¶ 14-15; Doc. 69, Response SOF, ¶¶ 14-15.

Logboat distributes and sells beer in 26 counties in Missouri, and has no plans at the moment to sell beer outside of Missouri. Doc. 65, SOF, ¶¶ 32-33; Doc. 69, Response SOF, ¶¶ 32-33. In contrast, Shipyard focuses its own sales and distribution of its products on New England, New York, New Jersey, Florida, and California. Doc. 65, SOF, ¶ 28; Doc. 69, Response SOF, ¶ 28. Shipyard's master distributor resells products acquired from Shipyard throughout the remainder of the United States. Doc. 65, SOF, ¶ 29; Doc. 69, Response SOF, ¶ 29. In 2016, 1,247 cases of Shipyard beer were sold in Missouri, approximately 500 of which included the –HEAD mark. Doc. 65, SOF, ¶ 30; Doc. 69, Response SOF, ¶ 30. In 2017, fewer than 1,000 cases of Shipyard beer were sold in Missouri, and approximately 300 of those included the –HEAD mark. Doc. 65, SOF, ¶ 31; Doc. 69, Response SOF, ¶ 31.

2

Logboat primarily targets drinkers of craft beer, but also aims to educate those who do not ordinarily drink craft beer. Doc. 65, SOF, ¶¶ 43-46; Doc. 69, Response SOF, ¶¶ 43-46.

Shipyard has been using the registered trademarks at issue since before Logboat applied for the registration of the mark SHIPHEAD GINGER WHEAT with the United States Patent and Trademark Office. Doc. 72, Defendants' Response to Plaintiff's Additional Statement of Material Facts ("Reply SOF"), ¶¶ 3-4; Doc. 65, SOF, ¶ 6, Doc. 69, Response SOF, ¶ 6.

## II. STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must resolve all conflicts of evidence in favor of the nonmoving party. *Mirax Chem. Prod. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). However, the Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. DISCUSSION

At issue are claims for trademark infringement and trade dress infringement. Both types of claim turn on whether there was a likelihood of confusion. The Eighth Circuit has held that "district courts can . . . decide[] likelihood of confusion by . . . summary judgment." *Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 980 (8th Cir. 2016); *see also Davis v. Walt*

3

*Disney Co.*, 430 F.3d 901, 905-06 (8th Cir. 2005) (affirming grant of summary judgment in defendants' favor where the "majority of the [relevant] factors weigh[ed] against a likelihood of confusion").

### a. Trademark Infringement

To establish trademark infringement, Shipyard would need to show that the Defendants' use of the SHIPHEAD GINGER WHEAT beer mark is likely to cause confusion as to the source of the product. *Walt Disney*, 430 F.3d at 903. Likelihood of confusion turns on six factors:

> 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion.

*Warner Bros.*, 840 F.3d at 981.

#### 1. Strength of the Marks

"A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *Frosty Treats v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005). A mark's strength is measured both conceptually and commercially. *Lovely Skin, Inc. v. Ishtar Skin Care Prod., LLC*, 745 F.3d 877, 888 (8th Cir. 2014).

Conceptual distinctiveness is analyzed to determine whether a plaintiff's mark is strong enough to merit trademark protection. *See Insty Bit, Inc. v. Poly–Tech Industries, Inc.*, 95 F.3d 663, 672 (8th Cir. 1996). The conceptual strength of a trademark is determined by its classification into one of four categories: generic, descriptive, suggestive, or arbitrary or fanciful. *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 486 (8th Cir. 1991) (citation omitted). The marks at issue, SHIPYARD, PUMPKINHEAD, MELONHEAD, and APPLEHEAD, "do[] not immediately convey an idea of the qualities and characteristics" of the goods at issue, namely,

4

beer. *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015). Instead, the marks "require[e] imagination to reach a conclusion as to the product's nature." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987). As such, they are at least suggestive marks, and therefore are "entitled to broad trademark protection without establishing secondary meaning." *Id.*

"In the likelihood of confusion context, commercial strength is based on the 'public recognition and renown' of the mark as shown by the amount of advertising, sales volume, features and reviews in publications, and survey evidence." *Zerorez*, 103 F. Supp. 3d at 1042. There is no dispute that Shipyard has been using its marks since before Logboat began using the SHIPHEAD GINGER WHEAT mark. *See* Doc. 72, Reply SOF, ¶ 3. Shipyard submits deposition testimony indicating that it has expended more than $1 million in advertising "in years past." Doc. 69-1, Forsley Depo Tr. 93:2-7. However, Shipyard claims to have been using the SHIPYARD mark since 1992. *See* Doc. 69, Plaintiff's Additional Statement of Material Facts, ¶ 2. Yet, Shipyard does not direct the Court to any evidence indicating when, during the 26 years it purports to have been doing business, it spent dollars on advertising. *Cf. Zerorez*, 103 F. Supp. 3d at 1042 (finding that plaintiff had "expended significant resources in advertising and promoting its business" where there was evidence "identifying $324,959 and $1,152,061 in *annual* advertising expenditures between 2009 through 2013, respectively) (emphasis added). Nor does Shipyard explain what the nature of the advertising was, or where it was directed. There is no evidence in the record indicating that Shipyard directed any advertising efforts at Missouri consumers. *Cf. Zerorez*, 103 F. Supp. 3d at 1042 (finding that mark had been used nationally since 2003 and in the local area at issue since 2005).

5

The commercial strength inquiry focuses on the market's recognition of the mark "at the time the mark is asserted in litigation." *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 867 (D. Minn. 2010) (quotation marks and citation omitted). Yet, although Shipyard initiated this action in May 2017, Shipyard has supplied evidence of sales from only 2016 and 2017. *See, e.g.,* Doc. 69, at 4 ("Shipyard has sold thousands of cases of beer in Missouri.") (citing Doc. 69, ¶¶ 30-31, which state that Shipyard sold 1,247 cases of beer in Missouri in 2016, and fewer than 1,000 cases of beer in Missouri in 2017); *cf. Zerorez*, 103 F. Supp. 3d at 1042 ("ZEROREZ's market share has increased from 3% in 2006 to roughly 20% at the time the Complaint was filed."). Thus, even assuming that Shipyard made all of the referenced 2017 sales before it brought this action, the record at best shows that Shipyard has sold fewer than 2,250 cases of beer in Missouri. Shipyard has not provided any evidence suggesting that this is a sizable number. Furthermore, Shipyard has supplied no evidence of sales from outside of Missouri.

Shipyard has also failed to submit publications or survey evidence to bolster its claims with respect to the strength of its marks. *See Lovely Skin*, 745 F.3d at 888 ("Lovely Skin presented no direct evidence, such as consumer surveys or consumer testimony, to demonstrate that its marks enjoy strong secondary meaning."); *cf. Zerorez*, 103 F. Supp. 3d at 1042 ("ZEROREZ has been featured in the Minneapolis StarTribune, and the Minneapolis St. Paul Business Journal has recognized ZEROREZ multiple times for its business growth and job creation.").

Shipyard thus has failed to demonstrate that its marks are commercially strong.

## 2. Similarity of the Marks

Shipyard's claims pertain to two different sets of marks. First, the SHIP— marks, including SHIPYARD and other marks containing the term,[2] and second, the –HEAD marks, MELONHEAD, APPLEHEAD, and two marks containing PUMPKINHEAD. *See* Doc. 38, ¶ 12.

Shipyard argues that its SHIPYARD mark and Logboat's SHIPHEAD GINGER WHEAT mark "look and sound alike" because they share "six out of eight letters." But no reasonable juror could conclude that the terms "yard" and "head" independently are similar in look or sound, outside of the negligible fact that they both end with the letter "d." The only real similarity between SHIPYARD and SHIPHEAD GINGER WHEAT is the term "ship," and Shipyard has admitted that "ship" is a generic term, not subject to trademark protection. *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999) (rejecting argument that "Lean Cuisine" and "Lean 'N Tasty" were confusingly similar, noting that "[w]ith the exception of the word "lean," which is generally descriptive of food and not registerable as a trademark, the two marks look and sound different").

Shipyard refers to a place where ships were built and repaired, a physical space. The term has been used in the English language since at least 1647. *See* Merriam-Webster dictionary, https://www.merriam-webster.com/dictionary/shipyard (last accessed April 26, 2018). The term "Shiphead," on the other hand, is not part of the English language. *See* Merriam-Webster dictionary, https://www.merriam-webster.com/dictionarysShiphead. The term was invented by an artist, a friend of the Logboat founders, to describe a fanciful vision of a

---

[2] Shipyard also owns the mark SHIPWEAR (Doc. 38, ¶ 12), but it does not argue that that mark should defeat Logboat's summary judgment motion. *See, generally*, Doc. 69 (nowhere mentioning SHIPWEAR). In any event, Shipyard's claims concerning that mark suffer from the same frailties as do its claims concerning its marks containing SHIPYARD.

woman with hair coiffed in the shape of a ship. Doc. 65, SOF, ¶ 4; Doc. 69, Response SOF, ¶ 4; Doc. 69-8, Hunt Depo. Tr. 13:21-14:2. Thus, the compound terms at issue cannot reasonably be described as being similar.

Shipyard's claims regarding its –HEAD marks fare no better. The marks PUMPKINHEAD, MELONHEAD, and APPLEHEAD have the name of a gourd or fruit followed by the word "head." In contrast, "SHIPHEAD" begins with the name of a type of vessel—neither a food nor a flavor. Apart from the undisputedly generic term "HEAD," the terms share no similarities.[3]

None of Shipyard's marks contain both "SHIP" and "HEAD" together. Nevertheless, Shipyard insists that the risk of confusion arising from the similarity between its SHIPYARD mark and Logboat's SHIPHEAD GINGER WHEAT mark is "enhance[d]" by Shipyard's –HEAD marks. In other words, because Shipyard owns both SHIP— marks and –HEAD marks, the compound SHIPHEAD must infringe its marks.

In support of this argument, Shipyard cites a case in which the District Court of Nevada looked to a family of marks to conclude that two marks were similar. In *Mine O'Mine, Inc. v. Calmese*, the court explained the "family of marks doctrine" as follows:

> A trademark owner may use a plurality of marks with a common prefix . . . to establish that it has a "family" of marks, all of which have a common "surname." The family "surname" is recognized by consumers as an identifying trademark in and of itself when it appears in a composite. Even though a junior user's mark may not be that close to any one member of the family, it may have used the distinguishing family "surname" or characteristic so as to be likely to cause confusion."

---

[3] Although Shipyard notes in its opposition to Logboat's motion for summary judgment that Shipyard has in the past produced a "GINGERBREADHEAD" beer and a ginger soda, it does not suggest that either the soda or the GINGERBREADHEAD mark is similar to the SHIPHEAD GINGER WHEAT mark. Moreover, it did not mention either of its ginger products in its amended complaint. *See, generally*, Doc. 38.

8

No. 10-CV-00043, 2011 WL 2728390, at **6–7 (D. Nev. July 12, 2011) (citation and quotation marks omitted), *aff'd*, 489 F. App'x 175 (9th Cir. 2012). In that case, the family "surname" was "Shaq," and the family marks included Shaq, ShaqTACULAR, and Shaq Attaq. The infringing mark was "Shaqtus." The surname was common both to the plaintiff's marks and to the defendant's mark, and it was distinctive. Here, in contrast, SHIPYARD, PUMPKINHEAD, MELONHEAD, and APPLEHEAD have no family "surname" in common, let alone one that is "distinguishing." As discussed above, the only common element of the –HEAD marks (the term "head") and the only common element of the SHIP— marks (the term "ship") are, by Shipyard's own admission, decidedly generic.

Furthermore, "the use of identical, even dominant, words in common does not automatically mean that two marks are similar." *Gen. Mills*, 824 F.2d at 627. "Rather, "in analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features." *Id*. The Court "may consider the marks' visual, aural, and definitional attributes . . . .'" *Luigino's*, 170 F.3d at 830 (citation omitted). Putting aside the concededly generic terms "ship" and "head"—neither of which is common to all of Shipyard's marks—the visual, aural, and definitional attributes of Shipyard's marks are not similar to those of Logboat's mark.

### 3. Degree of Competition

Shipyard focuses its own sales and distribution of its products on New England, New York, New Jersey, Florida, and California. Doc. 65, SOF, ¶ 28; Doc. 69, Response SOF, ¶ 28. Although a master distributor resells products acquired from Shipyard throughout the remainder of the United States, fewer than 1,250 cases of Shipyard beer were sold in Missouri in 2016, and in 2017, that number sank to fewer than 1,000. Doc. 65, SOF, ¶¶ 29, 31; Doc. 69, Response

9

SOF, ¶¶ 29, 31.  Approximately 500 of the cases sold in Missouri in 2016 and 300 of the cases sold in Missouri in 2017 included the –HEAD mark.  Doc. 65, SOF, ¶¶ 30, 31; Doc. 69, Response SOF, ¶¶ 30, 31.

Shipyard has presented no evidence that Shipyard had a sizable market in Missouri when Logboat applied to register its SHIPHEAD GINGER WHEAT mark, in 2014.  Indeed, there is no evidence in the record of *any* sales of Shipyard beer in Missouri prior to 2016—the year after Shipyard wrote Logboat a letter advising it of its infringement suspicions.  *See, generally,* Doc. 65; Doc. 65-7, Hunt Depo. Tr. 112:17-113:9; Doc. 69-7, Forsley Depo. Tr. 68:5-69:15.

Logboat distributes and sells beer in Missouri alone, and has no plans at the moment to sell beer outside of Missouri.  Doc. 65, SOF, ¶¶ 32-33; Doc. 69, Response SOF, ¶¶ 32-33.  Thus, while both companies produce craft beer, they target geographically different markets.

### 4. Intent to Confuse the Public

Shipyard does not deny that it lacks direct evidence of intent by Logboat to confuse the public.  Nonetheless, Shipyard argues that it may "demonstrate intent indirectly, through inferences derived either from the defendant's conduct . . . or from other circumstantial factors."  Doc. 69, at 9 (citing *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 596 (8th Cir. 1987)).  However, Shipyard omits the specific examples of "defendant's conduct" and "other circumstantial factors" that *Lomar* provides:  "below-cost pricing" and "defendant's relative size, entry barriers, etc."  Shipyard has not presented evidence of below-cost pricing, nor does it suggest that Logboat's relative size or entry barriers indicate an intent to confuse the public.

Instead, Shipyard argues that intent may be demonstrated by the following supposed facts:  (1) Logboat was on constructive notice of SHIPYARD because Shipyard's use and

10

registrations predate Logboat's existence, (2) Logboat began referring to the grassy area in front of its taproom as "The Shipyard," and Hunt thought the name "fit with the theme" of the brewery; (3) Logboat sold a Raspberry Shiphead Ginger Wheat beer and a Jasmine Shiphead Ginger Wheat beer for limited periods after Shipyard initiated cancellation proceedings with respect to the SHIPHEAD GINGER WHEAT mark at the Trademark Trial and Appeal Board.

Constructive notice of Shipyard's registration of the SHIP— and –HEAD marks does not evidence intent on Logboat's part to confuse the public. Indeed, the USPTO registered Logboat's mark, creating a presumption that it is distinctive. *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994) (noting that "[r]egistered marks . . . are presumed to be distinctive and nonfunctional"); *see also Lindgren v. GDT, LLC*, 312 F. Supp. 2d 1125, 1133 (S.D. Iowa 2004) ("Given that a USPTO examining attorney's search of the database failed to identify Lindgren's mark as confusingly similar to GDT's, this Court declines to find that such 'constructive notice' evidences a purposeful intent on the part of GDT . . . .").

The fact that, by July 2015 (when Shipyard apprised Logboat of its infringement suspicions), Logboat was referring to the grassy area in front of its taproom as "The Shipyard," and the fact that the founders thought the name "fit with the theme of [their] brewery" does not amount to evidence of intent to confuse customers looking to purchase SHIPYARD beer. The fact that, for a limited time, a grassy area in front of the taproom was described as a "yard" is unremarkable, and the fact that a brewery named "Logboat" called an adjacent patch of grass the "Shipyard" is not evidence—direct or indirect—of intent to confuse customers of Shipyard beer into purchasing Logboat beer instead. Indeed, Logboat had ceased describing the yard as the "Shipyard" by January 2016, and thereafter called it "The Park" instead—which evidences a desire to *avoid* confusion. As discussed above, "shipyard" is a word in the English language,

11

and the use of the term in reference to a space adjacent to a taproom, rather than in relation to any product purportedly competing with Shipyard, does not constitute even indirect evidence of intent to confuse.

Finally, Shipyard's contention that Logboat's limited sales of Raspberry Shiphead Ginger Wheat beer and Jasmine Shiphead Ginger Wheat beer are "in direct competition and overlap with Shipyard's HEAD flavored beers, thereby knowingly expanding its use and intentionally amplifying the likelihood of confusion," is unconvincing. Logboat did not co-opt Shipyard's "—HEAD" branding style. It did not call the beers "Rasberryhead" or "Jasminehead." Instead, Logboat added a descriptive element to its own properly registered mark to reflect what Shipyard itself describes as "a unique flavor profile . . . ." Doc. 69, at 10. Accepting Shipyard's argument would require precluding Logboat either from adding any new flavors to its ginger wheat beer, or from accurately describing any new flavors it adds to its ginger wheat beer. In other words, Shipyard's proposed prohibition against adding any terms descriptive of flavor or aroma to the Shiphead Ginger Wheat beer would prevent Logboat from experimenting and innovating with the beer itself—an unreasonable and untenable result for an action to protect a trademark.

Logboat's founders state that they were not even aware of Shipyard or its products when they came up with the name for their ginger wheat beer. Doc. 65-5 (Defendant Logboat's Answer to Plaintiff's Interrogatories); Response No. 12; Doc. 65-1 (Hunt Deposition), at 11:6-14; *see Luigino's*, 170 F.3d at 831 (finding, despite defendant's chairman's description of Lean 'N Tasty prior to its introduction as comparable to "Lean Cuisine entrees," that plaintiff "presented no evidence that [defendant] wished to capitalize on Lean Cuisine's strong trademark"). Logboat's founders state that the name "Shiphead" derived from an eponymous painting by a family friend. Doc. 65-1 (Hunt Deposition), at 27:2-4; Doc. 65-3 (Sharp

12

Deposition), at 11:8-11, 12:15-20; *see Luigino's*, 170 F.3d at 831 (noting that defendant explained that he chose the name "because use of the word 'light' would require compliance with too many regulations; because he thought the word 'low-fat' was overused; and because he did not agree with the consultant that the word 'lean' is associated only with meat"). In response, Shipyard has presented no evidence that Logboat was aware of Shipyard's existence before Shipyard wrote to Logboat regarding its infringement concerns.[4] In short, there is no evidence—direct or otherwise—of intent to confuse the public.

### 5. Degree of Care Expected of Customers

Shipyard argues that "consumers purchase alcohol in a casual setting that involves more impulsive decisions, rather than careful due diligence and advance research." Doc. 69, at 12. In support of this argument, Shipyard cites *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.*, 452 F. Supp. 429, 448 (W.D.N.Y. 1978), which concerned Miller's HIGH LIFE mark, and *E. & J. Gallo Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 457, 465 (N.D. Cal. 1991), which concerned "products arguably failing any classification as 'fine wines,'" and where

---

[4] Shipyard cites deposition testimony of its owner, Fred Forsley, that "Mr. Hunt acknowledged there was an issue with the Shiphead brand when he spoke with Mr. Forsley" to suggest that Logboat intended to confuse the public. *See* Doc. 69, Response SOF, ¶ 4. But even assuming that the self-serving testimony is accurate, it does not indicate that Logboat intended to confuse the public. By Forsley's account, Hunt did not acknowledge even being aware of Shipyard prior to July 2015, let alone an intent to confuse potential purchasers of Shipyard beer. The conversation Mr. Forsley describes is indicative only of a good faith desire on Hunt's part to resolve any potential dispute between the breweries. *See* Doc. 69-1, Forsley Depo. Tr. 57:8-58:1 ("I remember that he, kind of, felt like they – he agreed with me that there was an issue with the name and the packaging, and that he wanted to figure out a solution on time and a way to work it out. And I – to be honest with you, I felt we had a good relationship, good rapport on the phone and that he acknowledged that there was an issue and that they were going to figure out a way to sell out the packaging and work through this"). Further, it is not clear that Forsley's testimony would be admissible. *See* Federal Rule of Evidence 408(a) ("Evidence of the following is not admissible . . . to prove . . . the validity . . . of a disputed claim . . . (2) conduct or a statement made during compromise negotiations about the claim . . . .") .

13

plaintiff's employees testified that "the average American consumer is unlearned in the selection of wine." The alcohol products in each of those cases were not aimed at sophisticated consumers. Here, in contrast, Shipyard itself admits that the target consumers—craft-beer drinkers—tend to be "discerning." Doc. 69, at 11.

Still, Shipyard argues that Logboat's target consumers include not only craft-beer drinkers, but also those who do not drink craft beer, because Logboat aims to educate novices concerning craft beer. But to the extent that a potential customer does not already drink craft beer, he or she will not be a consumer of Shipyard beers—which also are craft beers. Therefore, no confusion can ensue. In any event, the chance that any customer—sophisticated or otherwise—would mistake "Shipyard Ale" or "Pumpkinhead Ale" for "Shiphead Ginger Wheat" cannot be great.

Still, Shipyard argues that customers in a bar "are often hurried to make a purchasing decision, as they stand several feet from a tap handle," and therefore they cannot "make a detailed side-by-side comparison," and the bartender may mishear the order. *Id.*, at 13. In the off-chance that a sophisticated customer purchases Shiphead Ginger Wheat beer while intending to purchase a Shipyard ale or one of the –HEAD beers in a crowded bar, they will immediately realize their mistake, since Shipyard does not make a ginger wheat beer. Doc. 65, SOF, ¶ 23; Doc. 69, Response SOF, ¶ 23.

Because customers of both Shipyard beers and Shiphead Ginger Wheat beer are likely to be "discerning," sophisticated consumers of craft beer, and given that there is little similarity between the names, this factor weighs against finding a likelihood of confusion.

14

### 6. Actual Confusion

There is no dispute that there is no evidence of actual confusion. *See* Doc. 69, at 11; Doc. 65, SOF, ¶¶ 19-21; Doc. 69, Response SOF, ¶¶ 19-21.

\* \* \*

Consideration of the six factors shows that there is no evidence to support a finding of likelihood of confusion. No reasonable jury could return a verdict for Shipyard on its claims for trademark infringement. *See Walt Disney*, 430 F.3d at 906 (affirming grant of summary judgment in defendants' favor on trademark infringement claim where "no reasonable jury could find a likelihood of confusion"). Defendants are entitled to summary judgment on the trademark claims.

### b. <u>Trade Dress Infringement</u>

"The trade dress of a product is the total image of a product, the overall impression created, not the individual features." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990). The parties' arguments regarding the trade dress claims focus on the likelihood of confusion. Like the trademark infringement claim, the claim for trade dress infringement depends on:

> (1) the strength of the owner's trade dress; (2) the similarity between the owner's trade dress and the alleged infringer's trade dress; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trade dress owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 (8th Cir. 1998) (quotation marks and citation omitted).

15

### 1. Strength of the Trade Dress

Favorable reviews in publications and media, advertising, and consumer surveys can be indicative of strong trade dress. *See Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 670 (8th Cir. 1996) (noting favorable reviews in trade magazines, home-improvement programs, and consumer survey responses in finding that plaintiff had demonstrated the strength of its trade dress). As discussed above, however, Shipyard has not furnished any publications, other media, or surveys to support its claims that its trade dress is strong. Indeed, outside of arguments concerning the strength of its marks, Shipyard makes no argument concerning the strength of its trade dress. *See* Doc. 69, at 3-4. Moreover, Shipyard admits that it has modified or redesigned its trade dress multiple times, including during the pendency of this litigation. *See* Doc. 65, SOF, ¶ 26; Doc. 69, Response SOF, ¶ 26. Even if these modifications merely "refresh[ed]" the brand, as Shipyard argues, they suggest a variability that weighs against finding the dress to be strong. This factor therefore does not support a finding of a likelihood of confusion.

### 2. Similarity of the Trade Dress

The Court has already concluded that the trademarks are not similar. The Court now considers the trade dress apart from the marks themselves.

Shipyard has admitted that the only cans at issue in this lawsuit appear as follows:[5]



Shipyard notes that both its own products and the Shiphead Ginger Wheat are attached to beer, include images that "resemble some sort of ocean-going vessel," and place their names (SHIPYARD and SHIPHEAD) "in the same location" on their cans. Doc. 69, at 6. Shipyard also claims that the "color palettes" for the cans are the same. *Id.*

In fact, the cans look very different from each other. Shipyard's can is beige with a red bar at the top and bottom. Logboat's can is white, with a black band towards the top and towards the bottom. SHIPYARD appears in an arc of blue letters of fairly uniform size, in a clean, straight font, outlined in white with a dark shadow. SHIPHEAD appears in wavy black letters outlined in white, with the first and last letters significantly larger than the rest, and the last three letters in the words "SHIP" and "HEAD" sloping downward in keeping with the triangular space between the sails of the pictured hairdo. The "S" in Shiphead has the tail of a marine animal.

---

[5] Although the Amended Complaint does not specify which Shipyard packaging is at issue in this case, it includes a picture of only one package, a can for Shipyard Export Ale. Doc. 38. The parties' arguments also focus only on that packaging. Doc. 65 at 19-20; Doc. 69, at 5-8. Because Shipyard has not presented any argument concerning any other trade dress it may own, the Court analyzes only the Shipyard Export Ale in assessing the claims for trade dress infringement.

Prominent on the Shipyard can is an image of a ship in water. Prominent on Logboat's can is an image of a woman carrying three cans of beer in one hand, with fish to one side, and with her dark hair styled in the form of a ship. No reasonable person viewing either can could confuse one for the other.

### 3. The Product's Type, Costs and Conditions of Purchase

The product at issue is beer, but each company produces different types. While Shipyard's Export Ale is a golden ale, Logboat's beer is a ginger wheat beer. Doc. 65, SOF, ¶¶ 22, 24; Doc. 69, Response SOF, ¶¶ 22, 24. Although Shipyard has previously made a ginger-flavored ale, Shipyard does not make a ginger wheat beer. Doc. 65, SOF, ¶ 23; Doc. 69, Response SOF, ¶ 23. While Shipyard's Export Ale is sold in bottles, cans, growlers, and kegs, Logboat's beer is sold in cans and kegs alone. While Shipyard's beers are sold throughout the country, Logboat's beer is sold only in Missouri. The types of products thus are similar, but different enough to allow the sophisticated beer drinkers that the craft brewers target to distinguish between them.

### 4. Degree of Competition, Intent to Confuse, and Actual Confusion

As discussed in Sections III(a)(3), (4) and (6), the breweries have geographically different target audiences, there is no evidence that Logboat intended to pass its Shiphead Ginger Wheat beer off as Shipyard beer, and there is no evidence of actual confusion.

*   *   *

Because there is no evidence supporting Shipyard's claims as to likelihood of confusion, no reasonable jury could return a verdict for Shipyard on its claims for trade dress infringement. *See Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1250 (8th Cir. 1990) (upholding grant of summary judgment in defendant's favor on claim for trade dress infringement where the

appellate court "believe[d] no reasonable trier of fact could find likelihood of confusion). Defendants are entitled to summary judgment on the trade dress claims.

IV. **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment.

/s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: June 25, 2018  
Jefferson City, Missouri